Adam L. HOUSER Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 18S00–9504–CR–459.

Supreme Court of Indiana.

Feb. 26, 1997.

Geoffrey A. Rivers, Quirk & Rivers, Muncie, for Appellant.

Pamela Carter, Attorney General, Preston W. Black, Deputy Attorney General, Office of Attorney General, Indiana Government Center South, Indianapolis, for Appellees.

BOEHM, Justice.

Defendant Adam L. Houser was convicted of felony murder and was sentenced to sixty years in prison. In this direct appeal, he raises several issues for our review:

I. Did the trial court err in admitting evidence seized pursuant to an allegedly illegal search of Houser's business?

II. Did the trial court err in admitting statements Houser made to police both before and after receiving *Miranda* warnings?

III. Did the trial court err in admitting drug paraphernalia as evidence of motive?

IV. Was the evidence sufficient to support a conviction for felony murder?

We affirm.

### Factual & Procedural Background

On November 8, 1993 John Murphy, eighty-eight years old, was found dead in his bedroom in Muncie, a victim of a gruesome murder. Murphy sustained multiple blows to the head with a hard object. Houser was charged with the murder a few days later.

Houser owned and operated Lee's Automotive, an auto repair business located a few blocks from Murphy's house. Murphy sold cars for part of his income and sometimes used Houser as his mechanic. Houser was an admitted drug user, and Mark White was a drug dealer who had sold Houser cocaine in the past. Approximately three days before the murder, Houser asked White to help Houser rob Murphy to obtain money for cocaine purchases. White never affirmatively refused but testified that he "blew it off" and wanted no part of the scheme. The day after the murder, Houser told White that he had robbed and killed Murphy and had left clothes worn during the murder at Lee's Automotive. Houser also revealed that he had hidden Murphy's money in the ceiling above Houser's office at Lee's Automotive. White was arrested on unrelated charges a few days later and, believing Houser was flush with cash from the robbery, asked Houser to bail him out of jail. When Houser refused, White reported Houser's role in Murphy's murder to the police.

Armed with White's statements, the police obtained a search warrant for Lee's Automotive. Officers arrived at the repair shop at approximately 6 p.m. on November 12, 1993 to execute the warrant. Houser, who was present when the police arrived, had a conversation with officers as the search was conducted. In this dialog, Houser denied any involvement in Murphy's murder and said his statements to White about committing the murder and hiding the money at Lee's Automotive were a "big lie." About fifteen to twenty minutes into the conversation, but before he was formally arrested, police read Houser his *Miranda* rights. At some point the officers found Murphy's wallet, without any cash, in the ceiling. They also seized drug paraphernalia and several objects with blood on them, including gloves, Houser's jeans, and a ball-peen hammer. The precise sequence of these events is unclear. It is clear that upon finding Murphy's billfold, police arrested Houser and took him to the Muncie police station.

That evening while in custody Houser gave a videotaped statement in which he described his version of events on the night of the murder. Houser claimed he and White picked up a hammer, pry bar and gloves

from Lee's Automotive, broke into Murphy's house in the middle of the night, robbed and murdered Murphy, and made off with an undisclosed sum of money that they shared. Houser asserted that White actually carried out the killing with the hammer as Houser watched. While in jail awaiting trial, Houser described to cellmate Rodney Johnson how the murder was carried out, indicating he, and not White, hit Murphy on the head with a hammer. Houser told Johnson that White agreed to the plan but backed out, and that Houser wanted to frame White for the murder. Houser stated the motive for the robbery was to steal money to repay debts to a drug dealer. In testifying in his own defense, Houser offered yet another version of events, asserting he was not involved in the killing as participant or spectator.

A jury convicted Houser of felony murder and burglary resulting in serious bodily injury. The trial court merged the burglary count into the murder conviction and sentenced Houser to sixty years in prison. Houser appeals. We have jurisdiction under Indiana Appellate Rule 4(A)(7).

## I. Validity of the Search Warrant

Before trial Houser unsuccessfully moved to suppress all physical evidence seized from Lee's Automotive, asserting the search was illegal because it had been based on an invalid warrant. Houser argues the warrant was defective because it contained the wrong street address, did not describe in detail the property that was to be seized, and failed to comply with the probable cause requirements of IND.CODE § 35–33–5–2. In particular, Houser claims that White's reliability was not established and, therefore, White's report to the police was not a sufficient basis for a determination of probable cause. Houser also argues that officers exceeded the authorized scope of the search by seizing items not named in the warrant.

The search in this case was carried out pursuant to a warrant issued by a magistrate. The trial court ruled that the warrant was issued with probable cause, and we are called upon to review that ruling.

### A. Standard of review on appeal.

■■■ A search warrant issued in this state must meet both federal constitutional requirements and the express statutory terms of IND.CODE § 35–33–5–2. We first address the degree of deference to be accorded two judicial rulings: the magistrate's decision that probable cause existed to support issuing the warrant, and the trial court's decision to uphold that determination. As the U.S. Supreme Court has directed, the reviewing court is to focus on whether a "substantial basis" existed for a warrant authorizing the search or seizure, and doubtful cases are to be resolved in favor of upholding the warrant. *Illinois v. Gates*, 462 U.S. 213, 236–39, 103 S.Ct. 2317, 2331–32, 76 L.Ed.2d 527, 547–48 (1983). "Reviewing court" for these purposes includes both the trial court ruling on a motion to exclude the seized evidence and the appellate court reviewing that decision. Some confusion has been expressed as to the standard of review to be applied by an appellate court in reviewing the trial court's evaluation of the magistrate's action.[1] However, de novo appellate review of a trial court's "substantial basis" determination has been followed by this Court without explicitly discussing the point. *See, e.g., Beverly v. State*, 543 N.E.2d 1111, 1114 (Ind. 1989); *Seltzer v. State*, 489 N.E.2d 939, 941 (Ind.1986). That is the correct standard. Because both the appellate and trial courts are reviewing the paper record submitted to the magistrate, there is no reason for appellate courts to defer to the trial court's finding that a substantial basis existed for issuing the warrant.

---

1. *See* WAYNE R. LAFAVE, 5 SEARCH & SEIZURE § 11.7(c) (3d ed. 1996) (describing state of law pertaining to proper standards of appellate review of probable-cause determinations as being "less than totally clear or complete"). The Supreme Court recently held that probable-cause findings by federal trial courts reviewing *warrantless* searches are subject to de novo review on appeal. *Ornelas v. United States*, 517 U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). However, other than what can be gleaned from *Gates* itself, the Court has not explained the standard for appellate review under the substantial basis test of a trial court decision as to the propriety of a warrant.

■ The issue next becomes the degree of deference to the magistrate's determination required of this Court by the substantial basis test. Commentators have debated the point without clear resolution, comparing that standard to "clear error" and "substantial evidence."[2] *Gates* itself did not elaborate on the meaning of substantial basis beyond noting that review should not be de novo and that the magistrate's findings are to be accorded "great deference." *Gates,* 462 U.S. at 236, 103 S.Ct. at 2331. More recently, in *Ornelas v. United States,* 517 U.S. ——, ——-——, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911, 919 (1996)—a case involving warrantless searches—the Supreme Court noted that the existence of probable cause is a mixed question of law and fact, whether a court or issuing magistrate is making the determination. One reading of *Ornelas* would suggest that where deference to a probable-cause determination is required, abuse of discretion is the proper standard. *Ornelas,* 517 U.S. at —— n. 3, 116 S.Ct. at 1661 n. 3, 134 L.Ed.2d at 918 n. 3.[3] However, *Gates* itself chose "substantial basis," which suggests something less deferential than abuse of discretion. Moreover, abuse of discretion is a widely used term that, if intended by *Gates,* would presumably have been adopted explicitly. This Court has already determined that significant deference to the magistrate's ruling is appropriate but has not sought to refine that point.[4] Whatever the

ultimate resolution of the issue, we need not deal with the niceties in the explication of "substantial basis" to decide this case. It is clear that substantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination. As explained below, under any even slightly deferential standard the warrant was proper.

B. *The warrant conformed with Indiana law and was issued with a substantial basis.*

■ White's account to police was the principal basis for the probable cause affidavit. Houser contends that White's credibility as an informant was never established. Upon receiving a request for a search warrant, the task of the issuing magistrate is to make a common sense determination, based on the totality of the circumstances, that there is a fair probability that a particular place contains evidence of a crime. *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. In addition to these federal constitutional requirements, Indiana has prescribed by statute the minimum information that must be presented to show probable cause. When based on hearsay, as here, the affidavit must "contain reliable information establishing the credibili-

2. In *Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 2085–86, 80 L.Ed.2d 721, 724 (1984), a per curiam opinion reiterating the holding of *Gates,* the Court actually used the term "substantial evidence" in discussing the standard to be employed by the reviewing court. However, this cue (if it was one) that reviewing courts should apply a substantial evidence test has not been taken by most of the federal circuits, which still adhere to *Gates'* "substantial basis." *See* LaFave, *supra* note 1.

3. The Supreme Court in the cited footnote 3 observed that the proper description of an appellate court's deferential review of a mixed law and fact issue is abuse of discretion and not "clear error," which applies to factual determinations. This was in the context of a discussion of the Seventh Circuit's lively internal debate over the proper appellate standard in reviewing a trial court ruling on a warrantless search. *See United States v. Spears,* 965 F.2d 262 (7th Cir.1992) (adopting "clear error" standard that Supreme Court reversed in *Ornelas* ). One could infer that

abuse of discretion is also the proper standard of review of a magistrate's ruling as well. In the same footnote, apparently elaborating "substantial basis," *Ornelas* cited *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), in which the Supreme Court noted that "substantial" carries two different meanings. There the Court reviewed a district court's ruling that a decision taken by the U.S. Secretary of Housing and Urban Development was not "substantially justified." *Underwood,* 487 U.S. at 557–59, 108 S.Ct. at 2546. In defining "substantially justified," *Underwood* drew on federal "substantial evidence" jurisprudence to hold that an agency's decision is substantially justified if it is "justified to a degree that could satisfy a reasonable person," meaning the decision has a "reasonable basis in law and fact." *Id.* at 565, 108 S.Ct. at 2543 (internal quotation marks omitted).

4. *See Beverly,* 543 N.E.2d at 1114; *Seltzer,* 489 N.E.2d at 941.

ty of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished," or "contain information that establishes that the totality of the circumstances corroborates the hearsay." IND.CODE § 35–33–5–2(b) (1993). In construing the predecessor to current IND.CODE § 35–33–5–2, we explained the logic underlying the statute: "Recognizing the dangers inherent in hearsay ... the Legislature incorporated specific requirements into the statute to assure that the hearsay constituting the probable cause was credible in the mind of the issuing authority and not merely in the mind of the affiant." *Madden v. State*, 263 Ind. 223, 225–26, 328 N.E.2d 727, 729 (1975) (emphasis deleted).

■ Here the affidavit outlined sufficient facts to support issuing the warrant—Houser told White that he had committed the murder and had hidden evidence related to it in Lee's Automotive. The basis for White's information—he got it from Houser—is plainly set forth. This case is wholly unlike, for example, *Williams v. State*, 528 N.E.2d 496, 499 (Ind.Ct.App.1988), *trans. denied*, where an affidavit was held deficient because it asserted that contraband was in a specific residence, but did not explain the basis for the informant's knowledge. The only real question presented in this case is whether, as the warrant statute requires: (1) White was a credible source; or (2) his hearsay statements were corroborated by surrounding circumstances described in the affidavit. Either is sufficient under the statute.

■ Muncie police had never used White as a source before; thus there was no inherent basis for concluding that White was credible. Moreover, the affidavit was based on "double" hearsay—the officer seeking the warrant was reporting what Houser had allegedly told White. Obviously, if White's account of his conversation with Houser is reliable, the veracity of what Houser told White is fairly inferred from its incriminating nature. There also was reason to conclude

that White was a credible source. First, as the officer noted, White's statements were incriminating of White as well as Houser because they suggested a conspiracy between White and Houser to rob Murphy. Declarations against penal interest can furnish sufficient basis for establishing the credibility of an informant within the meaning of IND.CODE § 35–33–5–2(b)(1). *Nash v. State*, 433 N.E.2d 807, 809–10 (Ind.Ct.App.1982) (construing predecessor statute).

■ More importantly, White's information was corroborated by the totality of the circumstances. As set forth in the affidavit, Houser's statements to White about the crime scene matched those personally observed by the officer who sought the warrant. In particular, the officer had observed Murphy's rear door pried open and the same detail appeared in White's report of Houser's admission. Murphy's wallet hidden at Lee's Automotive was consistent with the police's independent conclusion that robbery was the probable motive for the murder. The affidavit reported hearsay that contained details that could be known only to someone involved with the crime. That was sufficient corroboration within the meaning of IND. CODE § 35–33–5–2(b)(2) to support issuing the search warrant in this case. The magistrate made the required independent determination that White's statements were sufficiently corroborated to establish probable cause. This determination, in addition to meeting the Indiana statute, meets the requirements of a substantial basis to support the warrant.[5]

### C. Other alleged defects in the warrant do not require reversal.

■ Generally a search warrant should not issue unless it particularly describes the places to be searched and things or persons to be seized. U.S. CONST. amend. IV; IND. CODE § 35–33–5–2(a)(1) (1993). The State concedes that the warrant here erroneously placed Lee's Automotive at 1435 South Hoyt

---

5. The propriety of issuing a search warrant is assessed based on the facts known at the time and presented to the magistrate in the affidavit. *Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332–33; *Beverly*, 543 N.E.2d at 1113. Nonetheless it is noteworthy here that Houser later did not deny making these statements to White. Houser's "hearsay" is of course properly taken as credible because it is clearly against his penal interest.

Avenue, when the correct address was 1435 South Kinney Avenue. However, the warrant did correctly state that officers were to search a cement block building bearing the words "Lee's Automotive." Houser's business was located on a "triangular piece of land" bordered by South Hoyt, South Kinney and West Eighth Street. Although we do not condone use of search warrants containing the wrong street address, the warrant in this case sufficiently described the property to be searched despite the mistake. *See, e.g., Willard v. State*, 272 Ind. 589, 594, 400 N.E.2d 151, 155 (1980) (incorrect license plate number of motor home to be searched did not invalidate warrant because description of vehicle was otherwise "sufficiently specific" to enable officers to identify it). By all appearances the error was an innocent one and did not affect the probable cause determination. Under these circumstances reversal is not required. *Utley v. State*, 589 N.E.2d 232, 236–37 (Ind.1992).

 Houser also objects to the scope of the search, claiming "hundreds" of items were confiscated without authorization. The warrant authorized police to seize U.S. currency stolen from Murphy and clothing worn during the robbery and murder. Police did find Murphy's wallet (albeit containing no cash) in the ceiling as White said they would, as well as jeans and a hammer with blood on them. Other than a general reference to "tools" Houser does not specify which items were improperly seized or how he was prejudiced by their admission. The State argues that police had the right to seize these items, including the clothing and drug paraphernalia, under the "plain view" doctrine. Police do not need a warrant to seize incriminating evidence under the plain view doctrine if the following conditions are met: (1) police have a legal right to be at the place from which the evidence can be plainly viewed; (2) the incriminating character of the evidence is immediately apparent; and (3) police have a lawful right of access to the object itself. *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112, 123 (1990). There is no indication anything other than this occurred here. Muncie police officers had the right to be in Lee's Automotive. The wallet was found as the police were

searching in the ceiling for cash allegedly stolen from Murphy as described in the warrant. Houser does not contend that the other evidence seized was not in plain view. We detect no Fourth Amendment violation in the scope of the search in this case.

## II. Admissibility of Houser's Statements to Police

Houser also unsuccessfully moved to suppress all statements he made to police about the robbery and murder. Particularly at issue in this appeal are Houser's conversation with police at Lee's Automotive on November 12, 1993 and Houser's statements to police later that evening at the police station while in custody.

Police essentially detained Houser in a corner of Lee's Automotive as they executed the search warrant. At that point officers discussed the robbery and murder with Houser for approximately fifteen to twenty minutes without giving Houser the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Before receiving *Miranda* warnings, Houser admitted telling White he committed the murder but denied actual involvement in the killing, claiming he fabricated his account to White in order to impress him. After finding Murphy's billfold in the ceiling and some time after reading the *Miranda* rights, the officers placed Houser under arrest. Houser argues that he was in custody from the time police arrived at Lee's Automotive to execute the warrant and that he should have been given *Miranda* warnings before any questioning or conversation with police. The State contends that Houser was not in custody until the time of actual arrest and, alternatively, even if he was in custody all information was volunteered and therefore not the product of interrogation.

 It is axiomatic that *Miranda* warnings must be given before any custodial interrogation. *Loving v. State*, 647 N.E.2d 1123, 1125 (Ind.1995). A criminal defendant is deemed in custody if a reasonable person in the same circumstances would not feel free to leave. *Id.* Cases in which a person was restrained while police executed a search

warrant have gone both ways on the question whether the person was in custody for *Miranda* purposes. JOSEPH G. COOK, 2 CONSTITUTIONAL RIGHTS OF THE ACCUSED § 6:29 (3d ed. 1996). Until Murphy's billfold was found in Houser's ceiling, Houser was not formally under arrest. Nonetheless a reasonable person in Houser's shoes would not have felt free to go. As the search was underway police did not tell Houser he was free to leave and did not deny Houser's assertions that he was a suspect in the case based on White's information. It is at best questionable that police would have let Houser leave if he tried to do so.[6] Although one of the officers characterized the exchange as a "conversation" and not an interrogation, in light of the thorough search and effective detention of Houser at the scene, the exchange between Houser and the police bordered on express questioning. *Loving*, 647 N.E.2d at 1126; *see also Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 308 (1980) (interrogation for *Miranda* purposes includes "words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect").

■■■■ Assuming without deciding that *Miranda* warnings should have been given prior to the questioning of Houser at Lee's Automotive, Houser repeated all prejudicial statements after receiving *Miranda* warnings.[7] Thus any error in admitting the pre-*Miranda* statements was harmless because they were repetitive of properly admitted statements.[8] The post-*Miranda* statements were not coerced and therefore were properly admitted irrespective of any irregularity in

the pre-warning dialog between Houser and the officers.[9]

■■■■ More damaging statements came later that evening at the police station. However, they were not given in violation of Houser's rights. After being arrested and transported to police headquarters, Houser gave a videotaped statement to police. Before making the statement, Houser was again read *Miranda* warnings and also signed a waiver of rights form. Houser changed his story from a denial of involvement to a claim that he and White had carried out the robbery together. Houser said, among other things, that White beat Murphy on the head and that Houser was the one who found Murphy's wallet. Houser asserts that these post-arrest statements were coerced and should not have been admitted. The voluntariness of a statement to police is assessed based on the totality of the circumstances, with the focus on whether the statement was freely given. *Knight v. State*, 570 N.E.2d 1281, 1283 (Ind.1991). Here, Houser points to nothing that would support the conclusion that his due process rights were infringed. Houser was given *Miranda* warnings at the police station and yet he still agreed to speak with officers. Police acknowledged using typical interview techniques, such as "good cop, bad cop," but denied coercing or physically assaulting Houser. We see no reason Houser's statements should have been suppressed and, in fact, we have upheld confessions taken under similar circumstances. *See, e.g., Roell v. State*, 438 N.E.2d 298, 300 (Ind.1982) (confession held admissible where defendant was read *Miranda* warnings several times, continued to give statement, and all officers present stated they did not

6. While the police's subjective intent is irrelevant to the custody determination (unless communicated to the suspect), *Loving*, 647 N.E.2d at 1125, one officer in this case testified at the suppression hearing that Houser would have been "confined" had he attempted to leave Lee's Automotive.

7. Consistent with his trial testimony, Houser's pre-*Miranda* statements denied committing the murder. After *Miranda* warnings were given, Houser again admitted making the prejudicial statement to White and continued to maintain that it was a fabrication.

8. As we have held in prior cases, harmless error analysis applies to *Miranda* violations. *See, e.g., Sleek v. State*, 499 N.E.2d 751, 755 (Ind.1986). The error must be found to be harmless beyond a reasonable doubt. *Id.*

9. *See Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (rejecting application of "fruit of the poisonous tree doctrine" to Fifth Amendment context and holding that confession given after pre-*Miranda* incriminating statement is admissible if voluntarily made under the surrounding circumstances).

threaten defendant or mislead him into confessing).[10]

### III. Drug Paraphernalia as Motive Evidence

Houser argues that several drug syringes, a medicine bottle and six unidentified pills were wrongly admitted as evidence of his motive. Specifically Houser contends that the purpose and effect of admitting this evidence was to allow the jury to convict him for being a drug user and, therefore, the prejudicial impact of this evidence outweighed its probative value. Houser correctly notes that our evidence rules forbid admitting extrinsic evidence solely to show the defendant is a person of bad character. Ind. Evidence Rule 404. Although the State does not have to prove motive, nothing prevents it from doing so and motive evidence can be relevant to proof of a crime. *Id.* We review evidence rulings for an abuse of discretion. *Willoughby v. State*, 660 N.E.2d 570, 580–81 (Ind.1996).

The drug paraphernalia here tended to show that Houser had a drug habit to support and helps establish a motive for the crime. Moreover, it is consistent with White's testimony that Houser robbed Murphy to obtain money to buy drugs. Although Houser testified that the drug items belonged to an employee he had fired, Houser also told the jury that he was a cocaine and marijuana user. Accordingly, it is difficult to see how this physical evidence, even if wrongly admitted, prejudiced Houser. We see no abuse of discretion.

### IV. Sufficiency of the Evidence

Finally, Houser argues there was insufficient evidence to support a conviction for felony murder. Houser's theory of the case, to which he testified in his own defense, was that White committed the murder and framed Houser by planting incriminating evidence in Lee's Automotive and lying to the police about Houser's involvement. Houser also presented an alibi defense, claiming at trial that he was asleep at home when the murder occurred.

Houser's difficulty in offering this testimony is that nearly all the other witnesses contradicted this account and several testified that Houser asked them to lie in court. Although some physical evidence linked Houser to the crime, the strength of the State's case lay primarily in witness testimony, particularly that of White and Houser's cellmate Johnson. Because Houser testified, the jury was able to assess and directly compare his credibility with that of the other witnesses. When evaluating claims of insufficient evidence, we do not assess witness credibility. That is the jury's task. A conviction will be affirmed if there is probative evidence from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Fisher v. State*, 671 N.E.2d 119, 121 (Ind.1996), *reh'g denied.* The State presented such evidence here. Houser did not help his defense by offering inconsistent accounts of his role in Murphy's death to White, Johnson and the police, and then yet another story at trial. There were certainly grounds for the jury to conclude that Houser was not credible. We decline to accept Houser's invitation to reweigh the evidence.

### Conclusion

We find no reversible error. The conviction of Adam L. Houser for felony murder is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.

---

10. Houser also asserts his statement to police was involuntary because he was allegedly under the influence of several intoxicants and was short on sleep when the interview at the police station took place. However, the officers who interviewed Houser testified that he was coherent during the questioning and did not claim to be under the influence of alcohol or drugs. Absent any independent proof of intoxication, and Houser directs us to none on this record, this argument also must fail. *Cf. Roell*, 438 N.E.2d at 300 (rejecting similar argument under similar facts).